```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
```

|  |  |
|---|---|
| UNITED STATES OF AMERICA | : |
|  | : |
| v. | : Criminal Case No. DKC 03-321-3 |
|  | : |
| RAMONE STEPHON JONES | : |
|  | : |

**MEMORANDUM OPINION**

Ramone Stephon Jones is serving a total 360-month sentence imposed in 2005 for conspiracy to distribute over 5 kilograms of cocaine and 50 grams of cocaine base (300 months), money laundering conspiracy (240 months concurrent), money laundering (240 months concurrent), possessing a firearm in furtherance of a drug trafficking crime (60 months consecutive), and possession of a firearm after being convicted of a felony (concurrent). He has filed a motion for a reduced sentence. (ECF No. 835)[1].

Mr. Jones seeks to reduce his sentence to a total of 20 years, consisting of 180 months on the concurrent drug and money laundering counts, followed by a 60-month sentence on possession of a firearm in furtherance of a drug trafficking count. He argues

---

[1] He initially filed a motion pro se (ECF No. 820) but withdrew it when he learned that the Federal Public Defender would file on his behalf. (ECF No. 823). The Public Defender initially filed, but then corrected, a motion (ECF Nos. 833 and 835), along with a motion for leave to file excess pages. (ECF No. 832). That motion will be granted, as will the motions to seal certain material containing personal information. (ECF Nos. 840 and 845).

that this relief is warranted both for compassionate relief reasons and pursuant to Section 404 of the First Step Act. The Government opposes any relief.

**Motion for Compassionate Release**

Ordinarily, "[t]he court may not modify a term of imprisonment once it has been imposed[.]" 18 U.S.C. § 3582(c) (2018). This general rule is subject to certain exceptions, including the compassionate release provision, which allows the BOP to seek a modification of a prisoner's sentence. *See id*. § 3582(c)(1)(A). Under the First Step Act of 2018, the compassionate release provision was modified to allow prisoners to seek a sentencing reduction directly from the court. The provision now provides, in relevant part, that:

> The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1)  in any case—
>
> (A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors

>   set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
>   (i) extraordinary and compelling reasons warrant such a reduction; or
>
>   (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
>   and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

On December 2, 2020, the United States Court of Appeals for the Fourth Circuit ruled, in *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020), that a district court is empowered, under 18 U.S.C. § 3582(c)(1)(A), to consider any extraordinary and compelling reason that a defendant might raise, and specifically that district courts did not err in considering that mandatory consecutive stacked sentences for violations of 18 U.S.C. § 924(c), that would not be imposed under current law, resulted in sentences that exceeded those necessary to achieve the ends of justice.

Mr. Jones has been in federal custody since July 31, 2003, and has now served more than 19 years in prison. He calculates that he has already served the equivalent of more than a 240-month term, accounting for good-time credits. His current projected

3

release date is May 7, 2029.  He has earned his GED, finished vocational training programs, completed a culinary arts apprenticeship, and taken various other courses.  He says he has worked and assisted others, attends religious services, and maintained an unblemished disciplinary record for the last 11 years.  He suffers from asthma and hypertension and is obese, making him particularly susceptible to COVID-19.  Coupled with the disparity between the "overly punitive" sentence he received in 2005 and the sentence he posits he would likely receive today, he asserts that these factors support his request for compassionate release.

His sentencing disparity argument proceeds as follows.  In 2005, he faced a 20-year mandatory minimum due to his prior conviction, whereas today he would face only a ten-year mandatory minimum.  He argues that not only have the mandatory minimums for recidivists been reduced (20 years down to 15), but his predicate conviction would no longer qualify as a "serious drug felony" because he was only sentenced to serve twelve months, rather than to **more** than twelve months which is necessary to meet the current definition.  He also supposes that the guidelines would be lower based on quantity, that he would get a departure for overrepresentation of criminal history, and that a variance would result in a lower overall sentence.

4

**Section 404 of the First Step**

As an alternative argument, Mr. Jones asserts that he is eligible for relief under Section 404 of the First Step Act because he was convicted in count one of a covered offense.  Once relief is available, he then argues that the court can apply the changes to § 851 in the act which lowers the mandatory minimum to which he is subject.  He also contends that the sentencing package doctrine permits reduction on all three concurrent sentences.

The Fair Sentencing Act of 2010 was signed into law on August 3, 2010.  It did not apply to those sentenced before its effective date.  The First Step Act was adopted in 2018, and provides that, notwithstanding *Dorsey v. United States,* 567 U.S. 260 (2102), certain persons may seek a retroactively reduced sentence.  Section 404(b) provides:  "A court that imposed a sentence for a covered offense may . . . impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed."  Section 404(a) defines a "covered offense" as a violation of a federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act that was committed before August 3, 2010.

Section 2 of the Fair Sentencing Act altered the quantity threshold for the mandatory minimums in 21 U.S.C. § 841, and Section 3 eliminated the mandatory minimum for simple possession.

5

In *United States v. Wirsing*, 943 F.3d 175, 185-86 (4th Cir. 2019), the United States Court of Appeals for the Fourth Circuit concluded that a person is eligible if he was sentenced under 21 U.S.C. § 841(a) and (b)(1)(A)(iii) or (B)(iii).  In *United States v. Gravatt*, 953 F.3d 258, 262-64 (4th Cir. 2020), the Fourth Circuit held that a defendant remains eligible under the Act even if the conspiracy for which he was convicted encompassed distribution of both cocaine powder and crack cocaine.

In *Concepcion v. United States*, 142 S.Ct. 2389, 2396 (2022), the Court held that a trial court, in adjudicating a motion under the First Step Act, may consider changes of law or changes of fact. It is not compelled, however, to exercise its discretion to reduce any sentence based on such arguments.

## Discussion

Mr. Jones is eligible for consideration under Section 404 of the First Step Act because count one is a "covered offense."  Even though eligibility permits the court to apply all aspects of the current statute as well as factual changes, the sentence will remain unchanged.  Moreover, the court does not consider the combination of COVID, the changes in sentencing jurisprudence, and his conduct in prison to constitute compelling circumstances meriting compassionate release under the circumstances.

The facts as recounted in the Fourth Circuit opinion are as follows:

> Some time in 1997, Shahid Omar, who was running a drug distribution operation in Maryland, began to obtain cocaine in New York from Francisco Despiau. Despiau was a drug trafficker, with several sources of supply. He also outfitted vehicles with hidden compartments to help facilitate the transportation of drugs. Over time, Despiau sold several vehicles outfitted with hidden compartments to both Omar and Mason.
>
> Despiau's first transaction with Omar involved two kilograms of cocaine. Thereafter, Omar made trips to New York every five to six days, purchasing on average between three and five kilograms of cocaine. On some of these trips, Omar was accompanied by Mason. On one occasion, Mason, accompanied by **Jones**, went to New York to retrieve from Despiau approximately $35,000, which was previously left as a deposit for cocaine that ultimately could not be obtained at that time. Mason and Jones were unsuccessful on this trip, but Mason returned to New York a few days later and retrieved the money.
>
> Once the cocaine arrived in Maryland, Omar sold it to several customers, including Mason. Mason in turn had customers of his own, including Aaron Harrod. Harrod met Mason in 1999 and began purchasing cocaine from him. During one of these transactions, Mason brought Omar along with him. At the meeting, Harrod and Omar recognized each other, as they attended high school together. Based on this earlier acquaintance with Omar, Harrod began purchasing cocaine directly from Omar to avoid paying the middleman's premium charged by Mason.
>
> On September 4, 1999, Harrod met Omar to consummate a three kilogram transaction. Harrod approached Omar's vehicle and handed Mason, who was a passenger in the vehicle, $66,000. Moments later, Omar shot Harrod seven to eight times, wounding him. Omar was arrested and detained for the shooting. Thereafter, Mason attempted to get $25,000 from Despiau to give to Harrod in exchange for Harrod's promise not to testify against Omar. When Despiau

asked Mason what he would do if Harrod testified, Mason responded that he would "do" Harrod to prevent him from testifying. Harrod eventually received $25,000 and signed an affidavit stating that Omar did not shoot him. At Omar's trial, however, Harrod testified truthfully.

While Omar was incarcerated, Mason forged a direct relationship with Despiau. For his first transaction with Despiau, Mason traveled to New York with **Jones** and purchased 400 grams of cocaine. Thereafter, Mason purchased larger quantities of cocaine. For each of these transactions, Mason paid Omar a fee because Omar was responsible for finding Despiau as a source of cocaine.

In April 2000, law enforcement officers searched Mason's blue Ford Windstar. In the hidden compartment under the rear seat, the officers found a cache of weapons, including the gun that Omar had used to shoot Harrod. Following this search, Mason was arrested and incarcerated. As a result, Mason gave Melvin and **Jones** permission to contact Despiau, so that they could obtain cocaine from Despiau while Mason was incarcerated.

While Mason was incarcerated, Melvin and **Jones** traveled regularly, by themselves and with others, to buy cocaine from Despiau. On average, Melvin and/or **Jones** picked up approximately ten kilograms of cocaine per week. On one occasion, they purchased approximately thirty kilograms of cocaine. Melvin and **Jones** also obtained from Despiau numerous vehicles containing hidden compartments. Most if not all of the vehicles were placed in names other than those of the true users.

Melvin and **Jones** were assisted by drivers who picked up cocaine from, and delivered drug money to, Despiau. Melvin used Alexander as a driver, while **Jones** used Bennie Wilder.

In letters that Mason wrote to Melvin and **Jones** from jail, Mason insisted that Melvin and **Jones** pay him a fee every time they obtained cocaine from Despiau. In the late summer of 2002, Mason was released from jail and immediately began to purchase cocaine from Despiau. Between the summer of 2002 and the spring

of 2003, Melvin, Mason, and **Jones** together distributed at least eighty kilograms of cocaine.

Mason distributed some cocaine and cocaine base (crack) that he prepared in a microwave to Brian Elzey. Wilder also purchased cocaine from Mason in order to "cook" it into crack for resale.

By the spring and summer of 2003, **Jones** and Mason ran up such huge debts—Jones owing as much as $100,000, while Mason owed approximately $40,000—that Despiau cut off their supply of cocaine and sought to collect the money owed to him from prior deals. Melvin, **Jones**, Mason, and Alexander became increasingly frustrated by their inability to get more cocaine from Despiau and looked for alternate sources of supply.

During the summer of 2003, the Drug Enforcement Administration (DEA) intercepted conversations occurring over telephones utilized by Mason and Melvin, including numerous conversations concerning the sale and purchase of cocaine. Melvin and Alexander were overheard discussing which vehicles with hidden compartments should be taken to New York for the purpose of bringing back cocaine and strategies for avoiding police detection during these trips. Melvin, **Jones**, Mason, Alexander, and others discussed how they could pay off the debts owed to Despiau and how soon thereafter they would be able to get more cocaine. Melvin and **Jones** discussed an incident in which Alexander had fled from police after being stopped because he had a gun in the glove compartment. Alexander, in another intercepted call, described an incident in which he was shot at and had to go to his vehicle to retrieve a gun and return fire. Other intercepted conversations concerned weapons and the titling of vehicles and assets in the names of other persons, including Audrey Melvin (Deone Melvin's mother) and Derrick Tobias.

At the culmination of the investigation, on July 31, 2003, Melvin, **Jones**, and Mason were arrested, along with other codefendants. Law enforcement officers also executed search warrants at multiple locations. The officers found a Glock .45 caliber pistol in Melvin's bedroom at the apartment he shared with **Jones** in Upper Marlboro, Maryland. During wiretapped calls, Melvin and **Jones** discussed placing

9

> guns at the home of Dana Dark at 4310 Lavender Lane in Bowie, Maryland, because of their concerns that law enforcement might search their apartment. At the Lavender Lane location, the officers recovered a Ruger 9 mm pistol, a Heckler & Koch .40 caliber pistol, an Intratec 9 mm pistol, and a Masterpiece Arms .45 caliber pistol.
>
> In an area of Audrey Melvin's home utilized by Deone Melvin, agents found a rifle, a digital scale with cocaine residue, a Pyrex dish with crack residue, and other materials used for the packaging and cooking of cocaine, as well as a money counter. Upon his arrest, Melvin voluntarily waived his Miranda rights and agreed to be interviewed by law enforcement officers.
>
> At Mason's home at 415 Aragona Drive in Fort Washington, Maryland, law enforcement officers recovered a .38 caliber revolver with an obliterated serial number. In the hidden compartment of the blue Ford Explorer parked at the home, the officers found approximately 125 grams of cocaine and a Heckler & Koch .45 caliber pistol.
>
> In December 2003, law enforcement officers located Alexander at his girlfriend's home. In a Chevrolet Tahoe registered to Alexander's brother, but used by Alexander, the officers found a Heckler & Koch .40 caliber handgun.

*United States v. Melvin*, No. 05-4997, 2007 WL 2046735, at *1-3 (4th Cir. July 13, 2007). Judge Alexander Williams found that Mr. Jones was responsible for at least 150 kilograms of cocaine for guideline purposes and applied a three-level upward adjustment for being a manager in a drug conspiracy that had at least five participants. Today, those findings would result in an offense level of 39, as opposed to the 41 at the time of sentencing. With a Criminal

History category of III[2], the range is 324 to 405 months, still significantly above the 300 month sentence imposed on count one. The initial sentence was higher than the then applicable mandatory minimum, but under the guideline range, reflecting a careful assessment of the sentencing factors, and perhaps signaling that neither the mandatory minimum nor the guidelines were as important as the court's assessment of Mr. Jones' conduct, his history and characteristics, and the § 3553(a) factors, including avoiding sentencing disparity.

First, the court recognizes that this motion was filed while the COVID pandemic was worse than it currently is and was stayed pending other litigation. Nevertheless, the underlying medical conditions are not so significant that, by themselves, they would justify compassionate release. Moreover, the disparity argument pales in comparison to those cases that resulted in recognition of disparity as a basis for compassionate release. Had Judge Williams imposed a guideline sentence, the argument might have some force.

---

[2] Mr. Jones argues that he would likely get a departure to Criminal History II based on overrepresentation. Such departures are extremely rare and require a finding that the category either substantially overrepresents the seriousness of the criminal history or the likelihood that the defendant will commit other crimes. Here while he received mostly suspended sentences for each, the first involved 37.9 grams of crack, with a street value of $7,580, $2,526 in U.S. currency, and paraphernalia for distribution, and the second, four years later, involved a vehicle stop due to an open warrant, when the defendant fled, dropped a firearm, and was apprehended. He was arrested in this case on July 31, 2003, while he was still on probation.

But he did not.  Indeed, it was the below guidelines sentence that foreclosed relief on an earlier motion pursuant to 18 U.S.C. § 3582(c)(2).  (ECF No. 814).  In sum, neither the statutory changes nor asserted changes to prosecutorial policies create the kind of sentencing disparity that would present extraordinary and compelling circumstances in this case.

Second, while Mr. Jones is eligible for consideration for relief under Section 404 of the First Step Act, the court declines to grant relief.  As noted before, the current guidelines are still higher than the sentence imposed by Judge Williams.  In addition, the sentencing judge did not impose only the then applicable 20-year mandatory minimum for count one.  Furthermore, Judge Williams applied a three-level upward adjustment for being a manager of a conspiracy involving five or more participants.  Such a role cannot be described as minor in what was a brazen, long term, criminal conspiracy involving very large quantities of cocaine and possession or control over many firearms.

This court agrees that Judge Williams got it right.  Mr. Jones' conduct while in prison, while laudable, does not change this court's assessment of the appropriate sentence, even in light of the statutory changes.  The sentences will remain unchanged.

A separate order will follow.

                                                  /s/
                              DEBORAH K. CHASANOW
                              United States District Judge